## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KEVIN JOSEPH MAY** | **: CIVIL ACTION** |
| | **:** |
| **v.** | **:** |
| | **: NO. 17-3123** |
| **NANCY A. BERRYHILL** | **:** |

### MEMORANDUM

**KEARNEY, J.**                                                             **February 6, 2018**

Kevin Joseph May asks we reverse or, alternatively, remand the Commissioner of Social Security's denial of his application for Disability Insurance Benefits and Supplemental Security Income disability benefits. Mr. May contends the administrative law judge erred as a matter of law when she invalidated his lower IQ scores which met the listing criteria for disability because two sets of school-administered IQ scores varied and because of Mr. May's active work history and more recent role as sole caretaker of his elderly parents. The administrative law judge did not explain why she summarily disregarded IQ scores which may require a disability finding. The administrative law judge, in addressing other issues, explained Mr. May's work history but did not connect the later work history with invalidating his lower IQ scores before age 22. After careful review of the record, we remand for prompt re-evaluation of Mr. May's IQ tests before age 22 and to reach a finding as to whether Mr. May meets the definition of listing 12.05B or 12.05C.

### I. Background

Mr. May applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") disability benefits on January 23, 2013 claiming disability based on a primary

diagnosis of intellectual disorder and a secondary diagnosis of discogenic and degenerative back disorders.[1] Mr. May claims disability beginning July 29, 2009.[2] The Social Security Administration denied his claims on May 14, 2013.[3]

Mr. May requested a hearing before an Administrative Law Judge.[4] After hearing, Administrative Law Judge Suanne S. Strauss found Mr. May is not disabled for the relevant period under the Social Security Act for both DIB and SSI benefits.[5] ALJ Strauss determined, at step three of the five-step evaluative process, Mr. May's mental impairments, alone and in combination, do not meet or medically equal the criteria of listing impairments in Sections 12.02, 12.04, 12.05, 12.06, and 12.08. The Appeals Council denied Mr. May's request for review of the ALJ's decision on May 10, 2017.[6] Mr. May then filed this case.

## A. Educational history of intellectual impairment.

Mr. May is now 47 years old. As an 8-year-old in 1978, the school district identified Mr. May as "educably [sic] mentally retarded" and assigned him to a special education program.[7] In 1980, school testing showed Mr. May scored a verbal IQ of 73, a performance IQ of 60, and a full scale IQ of 64.[8] In 1985, at age 14 and in ninth grade, the school district's psychological assessment of Mr. May showed verbal IQ scored at 64; his performance IQ scored at 57; and his full scale IQ scored at 56.[9] The assessment noted the scores "are moderately below previous findings; however, when his level of academic growth is compared, these scores are consistent with that level of functioning."[10] The assessment concluded Mr. May's estimated level of intellectual functioning to be in the "mentally deficient" range.[11]

School records show an individualized education program ("IEP") for Mr. May for the 1987-1988 school year placing him in a program for the educable mentally retarded.[12] In the fall of 1987, when 17-years- old and in twelfth grade, a school re-evaluation report recommended

2

Mr. May be placed in a "full term program of special education as an educable mentally retarded student."[13] The 1987 evaluation assessed Mr. May's total reading at a first grade level and computation and word problem math skills at a second grade level.[14] The highest grade level of school completed by Mr. May is eleventh grade.[15]

### B. Work history.

The record shows Mr. May worked from 1988 to 2009.[16] Mr. May last worked for a moving company as a driver and mover until July 29, 2009 when he suffered injury in a work-related motor vehicle accident.[17] He has not been employed since this July accident.

Before working with the moving company, Mr. May worked as a tile setter helper for approximately six or seven years.[18] Mr. May testified he did not work much before the tile job, attributing his lack of work to his deficits in reading and writing.[19]

### C. Mr. May's medical records relating to back and neck injury.

After his 2009 car accident, Mr. May sought treatment with his primary care physician Jeffry Lindenbaum, D.O. for neck and back pain.[20] There is a substantial amount of medical records relating to treatment for chronic back and neck pain. We do not rehearse them here because Mr. May's challenge to the ALJ's decision is solely on her invalidation of IQ scores.

### D. Medical records relating to mental health treatment.

The record also contains treatment for mental health issues. Like records relating to back and neck treatment, we will not repeat the mental health history here.

### E. Intellectual disability consultative examinations.

The record contains two consultative examinations conducted by Ronald Langberg, Ph.D. in 2012 and 2013.

3

On February 22, 2012, Dr. Langberg conducted an individual intellectual evaluation for disability in connection with Mr. May's Initial application for benefits.[21] Dr. Langberg noted he did not have Mr. May's medical records for review, and there is no indication he had Mr. May's academic records.[22]

Dr. Langberg's evaluation noted Mr. May denied a psychiatric history and substance abuse, reported problems with reading and memory, and reported use of Oxycodone and morphine for back and neck pain resulting from the 2009 accident.[23] Mr. May told Dr. Langberg he resides with his parents, cares for his mother by helping with cooking and cleaning, and has a driver's license.[24]

As part of his evaluation, Dr. Langberg administered a Wechsler Adult Intelligence Scale test. Mr. May attained a verbal index score of 54, perceptual reasoning index score of 60, working memory index score of 50, processing speed index score of 56, and a full scale IQ of 49; all scores in the 0.5 percentile or less.[25] Dr. Langberg did not complete a medical source statement regarding Mr. May's ability to do work finding he "does not regard the reliability of the information obtained, in this case, as being adequate for either the formulation of a diagnosis or a meaningful assessment of functional limitations."[26]

On April 15, 2013, Dr. Langberg again examined Mr. May.[27] Dr. Langberg again noted he did not have Mr. May's medical records.[28] Dr. Langberg did not have academic records, and suggested the "academic records, in this case, would be helpful in the assessment of [Mr. May's] intellectual capabilities."[29]

Mr. May reported to Dr. Langberg problems with reading and writing, filing out applications, and remembering events requiring him to put "stuff on the calendar – the dates I have got to go somewhere."[30] Mr. May reported these as lifelong difficulties.[31] Mr. May

4

confirmed continued use of Oxycodone and morphine as prescribed by Dr. Lindenbaum for back and neck pain.[32] Mr. May described his social situation as residing with his parents, helping his grandmother with cooking once a week, performing household chores such as vacuuming, dusting, and washing clothes, but does not mow the lawn, and regularly food shops at Walmart paying in cash.[33] When questioned about making change in a cash transaction, Mr. May correctly answered one problem, but not another.[34]

Dr. Langberg found Mr. May's general appearance, behavior and psychomotor activity, speech, perceptual disturbance, thought process, and thought to be normal.[35] Mr. May reported his mood as depressed.[36] Dr. Langberg found Mr. May able to adequately conceptualize his ideas, respond abstractly to a proverb, and grasp the concept of similar and unlike objects.[37] Dr. Langberg found Mr. May with a "very limited fund of general information," unable to spell a word backward after correctly spelling it forward, unable to perform the mathematical computation of serial threes, but able to retain three of five items on a list after ten minutes.[38] Dr. Langberg found intact Mr. May's impulse control, judgment, and insight.[39]

Dr. Langberg could not make a diagnosis on Axis I, but diagnosed a mathematics and reading disorder on Axis II, functional illiteracy on Axis IV, and a Global Assessment of Functioning ("GAF") score of 54 on Axis V.[40] Dr. Langberg found while Mr. May has the capacity to handle personal care, health and hygiene, he has moderate to marked limitations in the capacity to shop, cook, and maintain a residence "by virtue of a limited capacity for arithmetic operations."[41] Mr. May self-reported he does not maintain friendships.[42] Dr. Langberg found Mr. May to have moderate limitations in his capacity to relate to co-workers, employers, and the general public.[43] Dr. Langberg found Mr. May to have a basic capacity to remember appointments independently and to complete assignments.

5

Dr. Langberg again administered a Wechsler Adult Intelligence Scale test. Mr. May attained a verbal index score of 61, perceptual reasoning index score of 67, working memory index score of 58, processing speed index score of 62, and a full scale IQ of 57; all scores in the first percentile or less.[44] Dr. Langberg found he "continues to have some question about whether or not the FSIQ obtained in testing is consistent with Mr. May's intellectual capabilities. We entertain this question by virtue of the claimant is recently having attained a driver's license and having driven himself to the office unaccompanied. Also had [sic] issue here, is the claimant's statement that he regularly purchases food for the family at Walmart given Mr. May's apparent inability to calculate all but the most simple of financial transactions. The examiner would suggest that academic records, in this case, would be helpful in the assessment of this claimant's level of intellectual abilities."[45]

Dr. Langberg prepared a medical source statement of Mr. May's ability to do work-related mental activities.[46] Dr. Langberg found Mr. May's impairments affected his ability to understand, remember, and carry out instructions.[47] Dr. Langberg indicated Mr. May is moderately limited in understanding and remembering simple instructions; carrying out simple instructions; and in the ability to make judgments on simple work-related decisions.[48] Dr. Langberg indicated Mr. May is markedly limited, defined as a "serious limitation" and "a substantial loss in the ability to effectively function" in the areas of understanding and remembering complex instructions, carrying out complex instructions, and in the ability to make judgments on complex work-related decisions.[49] Dr. Langberg did not respond to the question "is ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairments?" and indicated Mr. May is moderately limited in the ability to interact appropriately with the public, supervisors, co-

6

workers, and to respond appropriately to usual work situations and to changes in a routine work setting.[50] Dr. Langberg found Mr. May functionally illiterate.[51]

In March 2012, Alex Siegel, Ph.D. reviewed Mr. May's medical records and noted Dr. Langberg's report questioning the validity of his first evaluation, and found no other records addressing mental impairment at that time.[52]

When Mr. May applied for DIB and SSI benefits in 2013, Richard Williams, Ph.D. assessed Mr. May's mental residual functional capacity and mental status examination including IQ testing showing scores in the mentally retarded range and Dr. Langberg's concern over the reliability of the scores given "the totality of evidence in the claimant's life does not support and [sic] [mental retardation] status" citing, as examples, Mr. May's ability to drive, shop alone, maintain hygiene, and adequate concentration and attention.[53]

Dr. Williams disagreed with Dr. Langberg's finding Mr. May has moderate to marked impairments. Dr. Williams agreed Mr. May "does have some learning issues with which he deals" but concluded "the medical data in file does not establish a severity level of mental impairment that would prohibit employment in at least a simple, routine type job."[54] Dr. Williams considered Mr. May's allegations as "partially credible."[55]

By this time, March 2013, Dr. Williams had the academic records from the school district.[56] Dr. Williams did not address the results of the school-administered IQ tests.

In the medically determinable impairments and severity ("MDI") section of his consultative examination, Dr. Williams found "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above" for "A" criteria of the listings for section 12.05.[57] Dr. Williams found insufficient evidence regarding paragraph "B" criteria of listings regarding restrictions of activities of daily living, maintaining social functioning,

7

concentration, persistence or pace, and repeated episodes of decompensation of extended duration.[58] Dr. Williams explained his conclusion while Mr. May "may have been cognitively limited" in September 2012, "based on current data, there is not sufficient information to formulate an understanding of the claimant's functioning at that time."[59]

## F. Mr. May's and vocational expert's hearing testimony.

Mr. May testified he lives with his elderly parents and is their caretaker.[60] In his caretaking role, Mr. May cooks dinner for his parents and occasionally lunch, and testified while his siblings "come help once in a while" he is "the main kid that -- I mean main son that I live there and that's the agreement we had, that I take care of my parents, that I can live there almost for free for helping them out and all . . .."[61] Mr. May does the laundry and goes to the market, accompanied by his brother who helps him with reading.[62] Mr. May has a driver's license but does not take his parents to doctor appointments; he remains at home with his father when his mother goes to an appointment.[63] In answers to questions posed by his attorney, Mr. May agreed he is "like . . . a full-time home healthcare aide almost" to his parents and the pain medication prescribed by Dr. Lindenbaum does not affect his functioning in caretaking.[64]

Mr. May testified he cannot work because of his reading level and back pain, and it is hard to find a job because he can't read or write well.[65] In response to questions by ALJ Strauss why he could not do light or sedentary work, Mr. May responded he is still in pain and could work for an hour or two, but then would be in pain and have to sit or lie down.[66] Mr. May distinguished a job outside the home from his work in the caretaking of his parents, explaining he can sit down during the day while caring for his parents in the home.[67]

ALJ Strauss asked Vocational Expert Carolyn Rutherford to assume Mr. May is illiterate and has the physical ability to perform light and sedentary work but needs the work to be simple,

routine, repetitive without assembly lines, mandated teams, only occasional public contact, and no dangerous machinery, unprotected heights, and excessive heat. Ms. Rutherford concluded there is light or sedentary work in the unskilled range, for example laundry work positions, packing positions, and bench worker positions.[68]

## II. Analysis

Mr. May argues ALJ Strauss erred as a matter of law in failing to find his intellectual disability based on his 1985 full scale meets the requirements of Section 12.05B of the listing impairments. Alternatively, Mr. May argues his impairments meet the requirements of Section 12.05C and we should remand the action to the Commissioner for a determination.

Our review of ALJ Strauss's decision is deferential and her findings of fact are conclusive if supported by substantial evidence.[69] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[70] Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."[71] To determine whether substantial evidence supports a factual finding, we review the record as a whole.[72] We are bound by the ALJ's factual findings if they are supported by substantial evidence, even if we would have decided the matter differently.[73] We apply a plenary review of the ALJ's legal conclusions.[74]

An ALJ must determine whether the claimant is disabled when examining a challenge to the Commissioner's initial decision denying benefits. Under Title II of the Social Security Act ("Act"), a person who has contributed to the program who suffers from a physical or mental disability is afforded insurance benefits.[75] Under Title XVI of the Act, a disabled person may also be entitled to supplemental security income.[76] A disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

9

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[77] A claimant is only disabled if his impairments are severe to the point it makes his previous work impossible to do or precludes any other kind of gainful work available in the national economy.[78]

The Commissioner applies a five-step evaluation to determine if a claimant is disabled.[79] If the Commissioner finds disability or non-disability at any step during the analysis, the Commissioner will end the analysis.[80] Under step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.[81] If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two and is required to determine whether the claimant is suffering from a severe impairment or combination of impairments.[82] Under step three, if the claimant's impairments are severe, the Commissioner compares the impairments to a list of impairments presumed severe enough to preclude gainful employment.[83] If the claimant's impairments or its equivalent matches a listed impairment, the claimant is presumed disabled.[84] If the claimant's impairments do not match impairments on the list, the Commissioner proceeds to step four, where the Commissioner determines the claimant's residual functional capacity ("RFC").[85] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[86] In step five, if the claimant is unable to return to past work, the Commissioner must prove "there are other jobs existing in significant numbers in the national economy which claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]."[87]

### A. ALJ Strauss's decision.

ALJ Strauss considered the entire record including Mr. May's testimony and the testimony of a vocational expert. Applying the five-step evaluation, ALJ Strauss found at step

10

one Mr. May has not engaged in substantial gainful activity since July 29, 2009.[88] Moving to the second step, ALJ Strauss considered Mr. May's history of back and neck pain; presumed Mr. May has intellectual limitations notwithstanding IQ test results both supporting and not supporting his allegation of intellectual disability; Mr. May's treatment of obsessive compulsive disorder, depression, and anxiety; and treatment for elbow pain, carpal tunnel syndrome, and ulnar sensory neuropathy and concluded Mr. May has severe impairments.

At step three, ALJ Strauss considered whether Mr. May's impairments, alone or in combination, met or equaled any impairment described in the Listing of Impairments, particularly sections 1.00 (musculoskeletal) and 12.00 (mental disorders). At the time of ALJ Strauss's decision in January 2015, the criteria for meeting the listed impairments in Section 12.05 were:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR

- D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration, persistence, or pace; or
  4. Repeated episodes of decompensation, each of extended duration.[89]

The Commissioner's regulations set forth two requirements for a showing of intellectual disability; the claimant must show (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22, as set out in the introductory paragraph of 12.05, and (2) one of the four criteria in paragraphs A though D.[90]

ALJ Strauss found Mr. May did not meet the listing criteria of 12.05B because he does not have a valid verbal, performance, or full scale IQ of 59 or less and did not meet the listing criteria of 12.05C because Mr. May does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

At step four, the ALJ reviewed and considered the entire record and found Mr. May has the residual functional capacity to perform light work, limited to simple repetitive routine work without assembly lines, mandated teams, only occasional public contact, and no work in close proximity of dangerous machines, unprotected heights, or excessive heat.[91] In a detailed review of the record, ALJ Strauss recognized although Mr. May has various IQ scores "the record clearly shows that his adaptive functioning is much better" pointing to his work history as a tile setter and part-time work for a moving company; inconsistencies in Mr. May's statements in a Department of Public Welfare service plan and to his primary care physician "reflect[ing] poorly on the claimant's credibility;" caretaking of his elderly parents including regularly performing

household chores; and medical evidence supporting the residual functional capacity assessment.[92]

At step five, ALJ Strauss found Mr. May is unable to return to his past work as a tile setter and, considering Mr. May's age, education, work experience, and residual functional capacity, found jobs existing in the National economy in the area of assembly jobs, laundry worker, and packing jobs.[93]

### B. The ALJ's finding Mr. May does not meet listing 12.05B is not supported by substantial evidence.

Mr. May challenges ALJ Strauss's determination he failed to meet the listing criteria of Section 12.05B; "a valid verbal, performance, or full scale IQ of 59 or less." Mr. May points to the 1985 school-administered IQ test showing a performance IQ of 57 and full scale IQ of 56, bringing him within the criteria of 12.05B. Mr. May contends the ALJ erred as a matter of law because the 1985 IQ scores of less than 59 require a finding of disability *per se*.

At step three, ALJ Strauss found Mr. May did not meet the listing criteria of 12.05B because he does not have a valid verbal, performance, or full scale IQ of 59 or less.[94] ALJ Strauss based her conclusion on two reasons: (1) Mr. May's 1980 and 1985 school-administered IQ scores varied; and (2) Mr. May's prior work at a substantial gainful activity level and caretaking responsibilities for his elderly parents.[95]

While the ALJ may reject scores inconsistent with the record, it is not clear Mr. May's IQ scores are inconsistent with the record.[96] It is true Mr. May's school-administered IQ scores before age 22 vary. However, the school psychologist, Dr. Beyers, noted the 1985 scores "are moderately below previous findings," but "when his level of academic growth is compared, these scores and consistent with that level of functioning."[97] Dr. Beyers additionally noted Mr. May's "little academic growth over the past years," depressed verbal and performance scores, and

13

functioning at a "mentally deficient level."[98] The school placed Mr. May in a full-time special education program for "educable mentally retarded" in high school.[99] The 1987 evaluation assessed Mr. May's total reading at a first grade level and computation and word problem math skills at a second grade level.[100]

The record shows Mr. May meets the criteria for Listing 12.05B; his test scores show "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22 and a valid verbal, performance of full scale IQ of 59 or less. ALJ Strauss, however, invalidated those IQ scores, but did not explain or discuss why she invalidated them. This is particularly concerning when considering the later acquired IQ scores obtained by Dr. Langberg corroborating the earlier, school-administered IQ tests. While Dr. Langberg questioned the validity of the 2012 IQ scores, the 2013 IQ test shows a full scale IQ of 57, within the 12.05B listing. Dr. Langberg "continue[d] to have some question about whether or not the FSIQ obtained in testing is consistent with Mr. May's intellectual capabilities," he suggested "academic records, in this case, would be helpful in the assessment of this claimant's level of intellectual abilities."[101] There is no evidence Dr. Langberg ever assessed Mr. May's academic records. Additionally, the ALJ relied on the findings of Dr. Williams who, although in possession of Mr. May's academic records, did not discuss those records and instead disagreed with Dr. Langberg's 2013 findings of moderate and marked impairments.[102]

The ALJ's decision to invalidate the IQ scores appears to hinge entirely on a finding, at step four, Mr. May's adaptive functioning as an adult is "clearly above" and "far exceeds" his school administered IQ tests.[103] ALJ Strauss cited Mr. May's ability to drive (after obtaining a driver's license); caretaking his parents including cooking, laundry, and food shopping; social activity such as non-handicapped friends and playing in a band; and prior work history all led her

14

to conclude Mr. May's adaptive functioning invalidated the IQ tests.[104] Mr. May testified to his work as a tile setter involved grouting and "mix[ing] mud" and for the moving company driving and moving furniture.[105]

This type of work, however, is not inconsistent with IQ scores within the ranges of 12.05B and C. In *Markle*, our court of appeals found the functional abilities of a claimant who obtained a GED and who could read, write, add, and subtract, live alone and independently, care for his apartment, pay bills, use an ATM to access his bank account, go shopping and visit friends and relatives and had a previous work history as painting and wallpapering houses and cutting grass did not provide a basis to reject a full scale IQ score of 70 for purposes of Listing 12.05C.[106] Our court of appeals in *Markle* relied on the court of appeals' decision in *Brown v. Sect'y of Health and Human Servs.*[107] In *Brown*, the claimant challenged the district court's finding of substantial evidence to support the ALJ's rejection of IQ scores as inconsistent with functional abilities such as the ability to use public transit, possessing a driver's license, visiting friends, making change at a store, ability to do laundry and cleaning, and work as a truck driver.[108] The court of appeals found the functioning *not* inconsistent with the IQ test, and found no substantial evidence in the record to support the rejection of the IQ scores.[109]

We disagree with the Commissioner's argument distinguishing *Brown* as virtually obsolete. First, the Court of Appeals for the Sixth Circuit itself does not consider *Brown* obsolete, citing it in a 2016 decision.[110] Second, our court of appeals relies on *Brown* to support its opinion in *Markle*, a decision the Commissioner argues supports her position here. Finally, district courts in Pennsylvania, one as recently as 2014, cite *Markle* which in turn relies on *Brown*, for the proposition a claimant's ability to engage in simple daily activities "is not enough to invalidate otherwise valid IQ scores" within the listing range.[111]

15

Accordingly, we remand the matter to the ALJ to consider the requirements of both 12.05B and 12.05C listing criteria, determine the validity of the IQ scores in the record and explain the reasoning for rejecting any IQ test results as invalid.

**III. Conclusion**

In our accompanying Order, we grant Mr. May's Petition for Review and remand to the Commissioner to conduct a new hearing and re-evaluate the validity of all of Mr. May's IQ tests, make a finding on the validity of the IQ tests, explain the reasoning for rejecting as invalid any IQ tests, if at all, in the context of Mr. May's adaptive functioning, and determine whether Mr. May meets the listing criteria of 12.05B or 12.05C.

---

[1] ECF Doc. No. 8, Social Security Administrative Record ("R.") at R. 108-09. Mr. May filed an Initial claim for DIB and SSI disability on November 23, 2011 (R.68-76, R. 77-85) resulting in a "not disabled" determination. Mr. May did not request a hearing from these determinations.

[2] *Id.*

[3] R. 120-23; 124-28.

[4] R. 129.

[5] R. 23-40.

[6] R. 1-6.

[7] R. 351-53.

[8] R. 352.

[9] R. 351-53.

[10] R. 352.

[11] R. 352.

[12] R. 211-239.

[13] R. 219.

[14] R. 220.

[15] R. 273. Mr. May reported he withdrew from high school in twelfth grade and did not receive a GED. R. 430.

[16] R. 199.

[17] R. 49-50, 260 -67.

[18] R. 50-51, 58-59, 60-61.

[19] R. 51. Mr. May worked as a film developer from 1993-1999; a general laborer from 2006 to 2008; and as a driver/mover for the moving company from 2008 to 2009. R. 278.

[20] R. 425-28.

[21] R. 429-32.

[22] R. 429.

[23] R. 430-31.

[24] R. 431.

[25] R. 431.

[26] R. 432.

[27] R. 533.

[28] R. 533.

[29] R. 542.

[30] R. 534-35.

[31] R. 535.

[32] R. 535.

[33] R. 536.

[34] R. 536.

[35] R. 537.

[36] R. 537.

[37] R. 538.

[38] R. 538-39.

[39] R. 539.

[40] R. 539. As recently noted by our court of appeals "the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM–5, abandoned the GAF scale as a measurement tool. Because of this, the Social Security Administration now permits ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders; but instructed that a 'GAF score is never dispositive of impairment severity,' and an ALJ should not 'give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence.' SSA AM–13066 at 5 (July 13, 2013)." *Hughes v. Comm'r Soc. Sec.*, 643 F. App'x 116, 119 (3d Cir. 2016).

[41] R. 539.

[42] R. 540.

[43] R. 540.

[44] R. 540.

[45] R. 541-42.

[46] R. 543.

[47] R. 543.

[48] R. 543.

[49] R. 543.

[50] R. 544.

[51] R. 544.

[52] R. 72, 81.

[53] R. 96.

[54] R. 96.

[55] R. 96.

[56] R. 91, showing receipt of records from Bristol Jr. Sr. High School on March 7, 2013.

[57] R. 103.

[58] R. 103.

[59] R. 103.

[60] R. 52-53.

[61] R. 54-55.

[62] R. 55.

[63] R. 55.

[64] R. 56.

[65] R. 54.

[66] R. 58.

[67] R. 58.

[68] R. 60-61.

[69] *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

[70] *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005)).

[71] *Id.* (quoting *Rutherford,* 399 F.3d at 552) (internal quotations omitted).

[72] *Id.* (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.1999)).

[73] *Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (E.D. Pa. 2012) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)).

[74] *Scouten v. Comm'r Soc. Sec.*, --- F.App'x ---, 2018 WL 501368, at *1 (3d Cir. Jan. 22, 2018) (citing *Krysztoforski v. Chater*, 55 F.3d 857, 858 (3d Cir. 1995)).

[75] 42 U.S.C. § 423(a)(1)(D).

[76] 42 U.S.C. § 1381 *et seq.*

[77] 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A).

[78] *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

[79] *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).

[80] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[81] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability if claimant is engaged in substantial gainful activity).

[82] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability if claimant's impairments are not severe).

[83] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[84] *Id.*

[85] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[86] *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001).

[87] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Plummer*, 186 F.3d at 428.

[88] R. 28.

[89] 20 C.F.R. pt. 404, subpt. P, Appendix 1, § 12.05. In 2013, the Social Security Administration amended the listing to substitute "intellectual disability" for "mental retardation." *Myers v. Comm'r of Soc. Sec.*, 684 F.App'x 186, 189 n.1 (3d Cir. 2017). In September 2016, the Social Security Administration revised the criteria in the Listing of Impairments used to evaluate claims involving mental disorders effective January 17, 2017. *See* 81 Fed. Reg. 66138-01, 2016 WL 5341732.

[90] *Gist v. Barnhart*, 67 F.App'x 78, 81 (3d Cir. 2003).

[91] R. 31.

[92] R. 32-38.

[93] R. 38-39.

[94] R. 30.

[95] R. 30-31.

[96] *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003).

[97] R. 352.

[98] R. 352-353.

[99] R. 211-239; 353.

[100] R. 220.

[101] R. 541-42.

[102] R. 91, 96.

[103] R. 32.

[104] R. 32.

[105] R. 50.

[106] *Markle*, 324 F.3d at 183, 187.

[107] 948 F.2d 268 (6th Cir. 1991).

[108] *Id.* at 269-70.

[109] *Id.*

[110] *Joyce v. Comm'r of Soc. Sec.*, 662 F.App'x 430 (6th Cir. 2016) (distinguishing *Brown* on its facts in a 12.05C listing case).

[111] *See Ogin v. Comm's of Soc. Sec.*, No. 13-1365, 2014 WL 2940599, at * 11, n. 8 (M.D. Pa. June 30, 2014) (remanding for a re-assessment of claimant's IQ score where ALJ found claimant's ability to drive with adult assistance, play video games, use a computer, shop with adult assistance, watch young children for two hours or less, prepare simple meals, and perform simple household chores inconsistent with a full scale IQ of 65); *see also*, *Malone v. Astrue*, No. 11-750, 2012 WL 4107865 (W.D. Pa. Sept. 18, 2012) (citing *Markle* and *Brown*, and finding erroneous and not supported by substantial evidence ALJ's conclusion claimant's IQ scores not reflective or her actual functioning).